IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER **(603) 722-7466,** WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / ELECTRONIC SERIAL NUMBER **311480519297593**, THAT IS STORED AT PREMISES CONTROLLED BY VERIZON. | Case No. 20-mj- 66-01-AJ<br><br>**Filed Under Seal Level I** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Wesley R. Garland, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **(603) 722-7466**, with International Mobile Subscriber Identity/Electronic Serial Number **311480519297593** ("the SUBJECT PHONE"), that is stored at premises controlled by Verizon, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since May 2019. I am currently assigned to the Joint Terrorism Task Force ("JTTF") of the FBI's

Boston Division/ Bedford, New Hampshire office.  Before I became a Special Agent, I was a Police Officer in Virginia for nine years.  Over my career, I have investigated and assisted investigations of robberies, burglaries, larcenies, assaults, and murders.  During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants.

3. The facts in this affidavit come from my involvement in a collaborative investigation being handled primarily by the FBI and Manchester (NH) Police Department ("MPD"). This affidavit is intended to show that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2113 (Bank Robbery) and 18 U.S.C. § 1951 (Interference with Commerce by Robbery) have been committed by the users of the SUBJECT PHONE and possibly other unidentified co-conspirators.  There is also probable cause to search the information described in Attachment A for evidence, fruits, and instrumentalities of these crimes as further described in Attachment B.

## PROBABLE CAUSE

**A. Monday, December 2, 2019 (Rapid Refill Robbery).**

5. At approximately 8:53 p.m. on Monday, December 2, 2019, an unidentified male subject (UNSUB) entered Rapid Refill, 650 Second St, Manchester, New Hampshire.

6. Rapid Refill sells goods that travel in interstate commerce.

7. Victim store clerk advised the Manchester Police that UNSUB walked into the store with a dark grey revolver in his waistband.  The victim store clerk described UNSUB as a

black male, approximately 5' 8" to 5' 9", wearing a green hoody, light colored hat, jeans, and black gloves, with a scarf covering his face and a dark grey revolver in his waistband.

8. UNSUB pointed the firearm at the victim store clerk and asked him for money in the register and the store safe. The victim store clerk told UNSUB the safe has a 10 minute delay once the code is entered. UNSUB advised the victim store clerk he would wait.

9. At one point, another customer entered the store and approached the counter with items he was going to purchase. UNSUB told the customer he would take care of his purchase and he was good to leave.

10. Victim store clerk advised UNSUB left with approximately $3,000.00-$4,000.00 from the safe and approximately $200.00 in mixed bills from the register.

11. The Manchester Police Department responded and, among other things, obtained video of the robbery.

**B. Saturday, December 21, 2019 (Shell Gas Station Robbery).**

12. At approximately 12:25 a.m. on Saturday, December 21, 2019, victim store clerk was standing outside the Shell Gas Station, 887 Hanover Street, Manchester, New Hampshire when she observed a male jogging towards her from the West with a black, double barreled shotgun in his hand.

13. The Shell Gas Station sells goods that travel in interstate commerce.

14. Victim store clerk described UNSUB as 5'6", scrawny, grey hooded sweatshirt with the hood up, black pants, black bandanna covering his face, and what appeared to be white foundation make up on the upper portion of his face.

15. Victim store clerk said UNSUB told her to come open the registers and safe. Victim store clerk walked towards the registers and advised UNSUB she did not have access to

the safe. Victim store clerk retrieved approximately $186.00 in unknown denominations from the register and gave it to UNSUB. Victim store clerk observed UNSUB take approximately $120.00 in unknown denominations from her purse. UNSUB asked victim store clerk to open the second register and lottery. Victim store clerk advised UNSUB she did not have access to the lottery. Victim store clerk gave UNSUB approximately $100.00 in unknown denominations from the second register.

16. Victim store clerk advised that a victim patron entered the store and UNSUB ordered victim patron to the ground. UNSUB ordered victim patron to give him everything he had on him. UNSUB took everything victim patron removed from his pockets and left the gas station.

17. The Manchester Police Department responded and, among other things, obtained video of the robbery.

**C. Saturday, December 21, 2019 (Bank of New England Robbery).**

18. At approximately 8.00 a.m. on Saturday, December 21, 2019, UNSUB entered the Bank of New England, 1589 Elm St #1, Manchester, New Hampshire.

19. UNSUB was seen on camera driving around the bank at around 7:40 a.m. in a white hatchback. He stopped at the drive-thru ATM with no garments covering his face. He parked the vehicle in the parking lot on the Blodget Street side of the bank. UNSUB entered the Blodget Street side door of the bank after the victim manager unlocked the door. UNSUB approached the victim manager and victim teller and had what appeared to be a double barrel shotgun in his hand that he waved around.

20. UNSUB was described by the victim manager as a black male wearing white face makeup and what looked to be a black wig. He wore a dark knit beanie, blue scarf over the lower

4

part of his face, grey sweatpants with stains on them, and a black Northface jacket. He was estimated to be about 5 feet 8 inches tall and about 140-150 pounds.

21. Victim manager and victim teller advised the UNSUB forced them behind the counter and made them give him the money from the cash register. Victim manager and victim teller stated the UNSUB told them not to use bait money or dye packs. UNSUB was given $5,878.37 from the register. UNSUB directed the victim manager and victim teller to the "working vault" of the bank. From there he obtained over $27,000.00. UNSUB requested the victim manager and victim teller open the vault that was on a time delay. When UNSUB was advised by the victim manager and victim teller of the fifteen minute time delay on the vault. UNSUB advised them that he would wait. After the vault opened, UNSUB took approximately $128,000.00. UNSUB loaded the money into a box that he had emptied. UNSUB left the bank at approximately 8:17 a.m. and drove off in the white hatchback.

22. In total, UNSUB stole $160,323.00 from the bank.

23. The vehicle UNSUB used during the bank robbery was consistent with a vehicle stolen at around 1:00 a.m. near the Electric Street boat ramp, 59 Electric Street, Manchester, New Hampshire, and later recovered on the street in front of 1350 North Russell Street, Manchester, New Hampshire. It is unknown when the vehicle was left in front of 1350 North Russell Street, but, according to Google Maps, the vehicle was found just over a two mile drive from the Bank of New England.

24. I have reviewed video or pictures from each of the above described robberies. Based on my review of the videos and photos, the UNSUB that committed each robbery appears to be the same individual. In particular the UNSUB has distinct eyebrows, nose, and general facial structure that appear the same in all the photos and videos.

25.     Additionally, victims in all of the incidents described a very similar body type and build as well as similar behavior. Victims advised Manchester Police the UNSUB requested access to the safe in addition to the registers. For example, during the Rapid Refill robbery and Bank of New England robbery, the victims advised UNSUB that there was a time delay on the vault. In both situations UNSUB said he would wait for the time delay. Based on my training and experience, it is not common for a subject in a commercial robbery to show a willingness to wait for a vault with a time delay to open.

26.     Approximately three and a half weeks after the bank robbery, a Source advised the Manchester Police that he had information about the recent bank robbery. Source stated that **HECTOR RIVERA-AYALA (RIVERA-AYALA)** told the Source that he committed the recent bank robbery. Source said he would often tell **RIVERA-AYALA** he was risking years in prison when he would rob Dunkin Donuts for a small amount of money. Source stated **RIVERA-AYALA** met him in the Walmart parking lot in Manchester, New Hampshire a short time after the bank robbery, and told him he was not risking it anymore. **RIVERA-AYALA** told Source he "got it done." Source stated **RIVERA-AYALA** told him he robbed the bank. **RIVERA-AYALA** asked the Source how much is his rent. Source told **RIVERA-AYALA** it is $1,650.00. **RIVERA-AYALA** gave Source $1,700.00 in $100.00 bills.

27.     Source stated he saw **RIVERA-AYALA** with a new $32,000.00 chain necklace and a BMW. Source believes the BMW and chain necklace were purchased after the bank robbery occurred.

28.      Source advised **RIVERA-AYALA** talked about buying a couple "kilos" of cocaine from a guy for between $35,000.00 and $40,000.00.

29.     Source stated that he saw the photo of the bank robber on the news and believed it looked like **RIVERA-AYALA**.

30.     Source provided a phone number of 603-722-7466 for **RIVERA-AYALA**.

31.     Open source searches by law enforcement of the device with the assigned phone number 603-722-7466 showed the provider for the number is Verizon.  Records obtained from Verizon confirmed that Verizon is the provider for phone number 603-722-7466 and revealed that the International Mobile Subscriber Identity/Electronic Serial Number for the device associated with that phone number is **311480519297593.**

32.     In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

33.     Based on my training and experience, I know that Verizon can collect cell-site data about the SUBJECT PHONE.  I also know that wireless providers such as Verizon typically

collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

34. Based on my training and experience, I know that Verizon also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

35. Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

**AUTHORIZATION REQUEST**

36. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

37. I further request that the Court direct Verizon to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

38. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

/s/ Wesley R. Garland
Wesley R. Garland
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on March 6, 2020

HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **(603) 722-7466**, with International Mobile Subscriber Identity/Electronic Serial Number **311480519297593** ("the Account"), that are stored at premises controlled by Verizon ("the Provider"), headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period December 1, 2019 through December 31, 2019:

a. The following information about the customers or subscribers of the Account:

  i. Names (including subscriber names, user names, and screen names);

  ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  iii. Local and long distance telephone connection records;

  iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

  v. Length of service (including start date) and types of service utilized;

  vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

  vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

      viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

  b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

      i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 2113 (Bank Robbery) and 18 U.S.C. § 1951 (Interference with Commerce by Robbery) involving **HECTOR RIVERA-AYALA** during the period December 1, 2019 through December 31, 2019.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# **CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Verizon, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Verizon.   The attached records consist of _____.

I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon, and they were made by Verizon as a regular practice; and

b. such records were generated by Verizon's electronic process or system that produces an accurate result, to wit:

   1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon in a manner to ensure that they are true duplicates of the original records; and

   2. the process or system is regularly verified by Verizon, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                              Signature